_LlDREW, J.
This lawsuit arises out of Michael and Patricia Bellott’s August 1996 purchase of a residence located at 3501 Janice Drive in Ruston, Louisiana. The Bellotts appeal a judgment dismissing, on motion for summary judgment, their claims against Ru-ston Building and Loan Association and its Vice-President, Warren Post, who financed the Bellott’s home purchase. We affirm.

FACTS

Michael Bellott was transferred to a position in Arcadia, Louisiana from West Virginia. Upon arriving in Ruston on August 5, 1996 to search for a home, the Bellotts called the local Century 21 real estate office. The Bellotts first examined the residence which is the subject of this lawsuit on August 8th, staying for nearly an hour. After they inquired about why the soil in the backyard was soft, their real estate agent, Camille Burkhalter, told them that it had rained recently and that this was typical of soil in Louisiana. The Bellotts also noticed a pipe exiting the house’s crawlspace and asked what it was, but Burkhalter did not know. Mr. Bellott testified in his deposition that he was not concerned about the ground’s condition.
The Bellotts made an offer that day to purchase the home, but their offer was rejected. They looked at the same house again the next day. A second offer to buy was also rejected. While the second offer was still pending, the Bellotts approached Post about Ruston Building & Loan Association (“RBL”) financing their home purchase. Different types of loans were discussed at this August 9 meeting. According to Mr. Bellott, Post did not indicate that he personally knew anything about this home.
A third offer was made and accepted on August 10th. Listing Agent Theo Barr told the Bellotts that she did not know why the ground was mushy or what the white pipe in the crawlspace was. After the contract was accepted, Barr gave the | ^Bellotts a survey of the land showing that most of the property was in a flood zone. *18 The Bellotas left for West Virginia that same afternoon. When the Bellotas returned to West Virginia, they filled out loan papers and faxed them to Post.
Danny Carroll performed an appraisal for RBL on August 14, 1996. In the property description section of the Uniform Residential Appraisal Report, Carroll wrote that the drainage appeared inadequate and also checked a box indicating that the home is in a FEMA Special Flood Hazard Area. The notation about the flood hazard area was repeated in the MultiPurpose Appraisal Addendum. Under the heading “Conditions of Improvements” in the “Additional Comments” section of the appraisal, Carroll wrote:
There are soft areas and raised areas in the floor in the family, kitchen, and master bedroom. These areas need to be repaired, as well as the subfloor throughout the entire residence for wood damaged areas, needs to be checked. An engineers study would also need to be done to see if any of the peers [sic] have settled. The dirt under the residence is damp and there is a sump pump to remove excess water, this needs to be filled in and dried out. Water needs to be diverted away from the structure so as to keep the area under the residence dry. Any exterior rotten wood needs to be replaced and repainted.
Post called the Bellotas on the date of the appraisal to tell them about the appraisal and the status of their loan. Mr. Bellota testified in his deposition that he and Post talked about the house’s drainage problem. According to Mr. Bellota, Post told him that the sump pump would have to be removed from the crawlspace, additional dirt would have to be placed under the house and landscaping would be done to remedy the drainage problem. Mr. Bellota recalled that Post told him the repairs listed in the appraisal would be done before closing. After their telephone conversation, a copy of the “Conditions of Improvements” page was faxed to Mr. Bellota, who read the faxed page. The entire appraisal was faxed later.
On August 15, 1996, Professional Engineer Robert Davis conducted a structural inspection of the house and property for Chautauqua Realty. In the | ¡¡conclusion to his written report, .Davis commented that he had found conditions typical of residences in that area, such as water and/or termite damaged flooring, sub-flooring and floor joists in limited areas of the house, minor cracks in the baseboard in the corner of one bedroom and tile damage in one bathroom.
In an August 25, 1996 letter to Theo Barr of Chautauqua Realty, Davis wrote:
I conducted a follow-up inspection of the above referenced property on Friday, August 23, 1996. All repairs noted in the inspection report dated August 15, 1996 have been satisfactorily completed. It is further recommended that an annual termite inspection/treatment program be conducted at this residence. In addition the drainage should be maintained in its present state to prevent excess water from collecting beneath the structure. Small amounts of water and moisture beneath the structure should not be a cause of concern.
Carroll signed a “Satisfactory Completion Certificate” on August 26, 1996. The form language of the certificate states, in part, “I certify that I have reinspected subject property, the requirements or conditions set forth in the appraisal report have been met, and any required repairs or completion items have been done in a workmanlike manner.” Carroll added:
The subject’s repairs appear to have been completed and other inspections where [sic] to have been done by an engineer, exterminator and a dirt contractor, Written verification as to the compliance of the appraisal is to be furnished to the lender by the other inspectors.
The Bellotas returned to Louisiana on August 25, 1996 and conducted an exami *19 nation of the house that afternoon with realtor Eddie Barnes. The Bellotts questioned Barnes about the yard and the pipe which exited the crawl space. Mr. Bellott thought the pipe may be connected to the sink or washing machine. A new kitchen floor had been installed and the raised area in the den had been repaired. The wall in one bathroom had been painted where the wallpaper had been removed. Mr. Bellott saw that grading work had been done on the property. This grading included dirt having been pushed from the crawlspaee down towards the |4backyard. Mr. Bellott contends that while grading work was done, water was not diverted from the house.
The closing took place on August 26. The Bellotts allege that they were informed during the closing that they could not have a copy of the engineer’s report. Upon taking possession of their newly purchased home, the Bellotts detected foul odors while cleaning parts of the house.
Michael Bellott testified that there were two inches of water under the house on September 27, 1996. When the Bellotts told Theo Barr about the water, she allegedly told them to turn on the sump pump. The Bellotts had believed the sump pump had already been removed when they purchased the house. Apparently, the pipe exiting from the crawlspaee, which the Bellotts had seen on earlier visits, was part of the sump pump. When the Bellotts asked Barr why the sump pump remained under the house, Barr allegedly told them that workmen had said no harm would be caused by leaving the sump pump under the house. The sump pump was eventually removed that October.
The Bellotts soon learned that raw sewage had leaked into their home on two separate occasions before they purchased the house. After the Bellotts and their children began suffering health problems which they associated with the condition of the house, the Bellotts left their home on Janice Drive in March of 1997.

Procedural Background

Michael Bellott and Patricia Bellott, individually and on behalf of their two minor sons filed suit on July 15, 1997 against seemingly everyone involved in the selection and purchase of their home. Named as defendants were their vendors, the closing attorney and his law firm, Camille Burkhalter, Eddie Barnes and J.E. Barnes Realty d/b/a Century 21 Realty, Theo Barr, Warren Post and Ruston Building & Loan Association. The cause of action against the vendors was based | fiin redhibition. The cause of action against the remaining defendants was based in negligence.
The Bellotts alleged that: (i) when the residence was connected to the city sewer system in September 1995, the existing septic system was filled with dirt; (ii) raw sewage backed up into the house and remained there for several days in October 1995; (iii) raw sewage again backed up into the house in December 1995, and this condition was not repaired until February of 1996; (iv) when Post faxed them the appraisal, Post assured them that whatever repairs were required by the appraisal, which Post stated “as being removal of the sump pump and filling in under the house and diverting away the water to remedy the drainage problem” would be completed prior to closing because it is the law; (v) while a minimal amount of grading was done to alleviate the drainage problem, the work ordered in the appraisal to remedy the drainage problem was not completed or even attempted; (vi) based upon Camille Burkhalter’s statement that the engineer’s report did not contain any information that would discourage them from purchasing the home, as well as assurances by Post and others that the repairs had to be completed prior to closing, they purchased the home; (vii) they first learned on October 7, 1996 about how sewage had previously backed up into their home; (viii) the house had an unbearable stench and their children became ill; (ix) fearing for their health, they *20 would occasionally stay at a motel; (x) testing of the water underneath the house showed the presence of fecal coliform bacteria; and (xi) around December 3, 1996, they learned from Davis that he had told Barr that the home has intractable drainage problems that are impossible to repair.
An amending petition was filed on August 8, 1997, adding Danny Carroll and Robert Davis as defendants.
Post and RBL filed a motion for summary judgment on November 20, 1997. Submitted in support of the motion were Post’s affidavit, the appraisal, the | ^engineering report, Carroll’s completion certificate, Davis’s letter and Michael Bel-lott’s deposition. Post attested that he never personally inspected the premises and had no personal knowledge of the condition of the property exclusive of the information provided in the appraisal and engineer’s reports. Post further stated that he obtained an appraisal which he forwarded to the Bellotts prior to the closing, an engineer’s report based on the appraiser’s recommendation, and also pri- or to the loan closing, the “Satisfactory Completion Certifícate” and Davis’s letter.
In opposition to the motion for summary judgment, the Bellotts filed three affidavits and a letter concerning their attempted purchase of a home in West Virginia. Patricia Bellott recounted in one affidavit the telephone conversation she had with Post on August 14, 1996 when he read to her the repairs listed in the appraisal. Mrs. Bellott stated:
After reading that portion of the appraisal report to me, Mr. Post then explained and interpreted this portion of the report to me, in his, (Post’s) own words. Mr. Post said that there was a sump pump under the house, and that the house had a drainage problem, and that this was unacceptable to the appraiser. Mr. Post said that the house was going to have to be fixed so that water no longer came under the house. Mr. Post said, that the sump pump was going to have to be removed, and that the hole where the sump use [sic] to be, would be filled in with dirt, as well as other areas under the house, (where it was damp), being filled in with dirt. Mr. Post said that landscaping work was going to be done, to solve the house’s drainage problem. Mr. Post said that an engineer was going to do an inspection, to see if any of the peers [sic] had settled underneath the house.
Mrs. Bellott continued in this affidavit that if Post had not explained the conditions of improvement and had not told her how the drainage problem would be resolved, then she would have called Carroll to question him about his appraisal report.
In a second affidavit, Mrs. Bellott gave an account of a telephone conversation she had with Post in late December 1996 or early January 1997 concerning the prior sale of the house to their vendors. She stated that Post told her that a bank could release money for the purchase of a house even if any |7conditions of the house, including a septic system, could not pass a state health inspection. The Bellotts together gave a single affidavit in which they described their initial meeting with Post. They stated that Post told them that under the law, he would have to be sure that all of the repairs listed in the appraisal had been performed before he could release the funds for their loan.
On July 23, 1998, the trial court submitted its “Opinion” regarding the summary judgment at issue. The court concluded that Post had a duty to disclose any material information to the Bellotts that he knew or should have known, but there was no evidence that Post had any knowledge of the premises except what he learned from the reports of Carroll and Davis. A judgment granting Post and RBL’s motion for summary judgment was rendered on August 17,1998.

DISCUSSION

Summary Judgment

, The summary judgment procedure is designed to secure the just, speedy and in *21 expensive determination of every action, except those disallowed by law; the procedure is favored and shall be construed to accomplish those ends. La. C.C.P. art. 966(A)(2)'.
Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). A fact is material if its existence or non-existence may be essential to the plaintiffs cause of action under the applicable theory of recovery. Curtis v. Curtis, 28,698 (La.App.2d Cir.9/25/96), 680 So.2d 1327.
If the movant will not have the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant is not required to negate all essential elements of the adverse party’s claim, action or defense. | Jnstead, the movant need only show the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action or defense. If the adverse party then fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La. C.C.P. art. 966(C)(2).
Further, La. C.C.P. art. 967 provides, in part:
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.
We conduct a de novo review of the documents supporting and opposing a motion for summary judgment under the same criteria which governs a trial court’s determination of whether summary judgment is appropriate. Jackson v. Beasley, 30,359 (La.App.2d Cir.4/8/98), 712 So.2d 162.

Negligent Misrepresentation

In order to recover for negligent misrepresentation, a plaintiff must establish: (1) a legal duty on the part of the defendant to supply correct information; (2) a breach of this duty; and (3) that the breach caused damages to the plaintiff. Long v. Bruns, 31,427 (La.App.2d Cir.1/20/99), 727 So.2d 664.
The Bellotts contend in their original petition that: (i) Post and the realtors were in possession of material facts about the residence and failed to convey these facts to them, despite having a duty to do so; (ii) the realtors and perhaps Post had knowledge of the prior sewer spills but failed to convey this fact to them; and (iii) Post and the realtors “had knowledge that the repairs called for in the appraisal report (e. g., extensive flooring repairs, remedying the drainage problem with fill dirt and removal of the sump pump) were not completed and/or were not going to be completed, but nevertheless continued to tell petitioners that the repairs called 1¡¡for in the appraisal report were going to be completed because ‘it’s the law’ ”
The circumstances that are at the heart of the Bellotts’ complaints are most evident in Paragraphs 31 and 33 of their original petition, which read:
Petitioners came to the inevitable conclusion that the house they had purchased simply was not habitable. Though the city water and sewer departments opined that their systems did not leak, the yard and soil underneath the house remained saturated with water. Gutters, venting and landscaping did not alleviate the problem — and no workman could propose any solution, either. Worse, the ever-present water standing under the house had dangerously high levels of bacteria — and most *22 likely other pathogens — from human excrement. The house had odors that were at times overbearing and nauseating to the point that petitioners simply had no choice but to leave the house or become physically ill.
[[Image here]]
During the course of their occupancy of the house, petitioners spent a good amount of time trying to remedy the problems, suffered through bouts of horrible odors, learned that their home held raw sewage in it for weeks at a time and that the prior owner moved out after the sewage spill never to return, that the owner, realtors and others had known of the sewage back ups but never told them and sold petitioners the house anyway, and, perhaps worst of all, learned that water underneath their house, which never seemed to dry up and whose presence could not be explained nor diminished, contained dangerously high levels of bacteria from human excrement. Their sons’ pediatrician even termed the house a health hazard and they had watched their children’s health deteriorate after moving into the house. At various times these matters caused petitioners to be upset and irritable, depressed, they suffered from stomach disorders and sleeplessness, headaches, nausea and, because of their suffering, they were sometimes unable to be the loving and earing parents their two sons had always known.
Regarding the fact that sewage had leaked into his home before he purchased it, Mr. Bellott stated, “... I can tell you that I wouldn’t have bought a house that I knew had crap in it, I guarantee you that.” According to Bellott, these leaks were not caused by any defects in the home’s sewer system. Rather, the sewage backed up into the house because Ruston’s sewer station had gone off-line.
The Bellotts allege that “perhaps Post had knowledge of the prior sewer spills but failed to convey this fact to the [them].” Our emphasis. Mr. Bellott testified that he has no evidence that Warren Post or anyone else at RBL knew that l10the house had had problems with sewage backing up into it. Thus, even if Post had a duty to inform the Bellotts of the prior sewage leaks, this duty could not have been breached if Post was unaware that sewage had previously entered the home.
Plaintiffs argue in their brief that “[w]hether Warren Post, as an employee of Ruston Building & Loan Association, knew of the defects in the property is a subjective fact which is inappropriate for summary judgment.” Yet, the Bellotts have no evidence regarding Post’s knowledge of any alleged defects.
Mr. Bellott was questioned about why he thought a September 10, 1993 letter to Post from the Parish Sanitation Manager regarding a nearby house is related to Post’s knowledge of the Bellotts’ house:
Q: Okay, how does this tell us that Mr. Post knew that your house was going to have those problems?
A: I didn’t say that Mr. Post knew that my house was going to have them problems. I said he knew that land. He’d dealt with that area before.
When asked if he was accusing the defendants of conspiring to sell the house to harm him, Mr. Bellott replied, “I don’t know about using that word, but they were all knowledgeable of this property, except maybe for Warren Post, about this property.” Our emphasis.
The Bellotts also allege that Post assured them the repairs listed in the appraisal would be completed prior to closing. They contend that the sump pump remained under the house even though Post told them it would be removed. Mr. Bellott testified in his deposition that he and Post talked about the drainage problem during their August 14 telephone conversation about the appraisal. Mr. Bellott stated:
Well, what they said in the appraisal report was that — that the house had a *23 sump pump and that it was damp — the dirt was damp underneath the house. So, Warren and I talked about this and Warren — I asked Warren about the drainage problem. He told me, he says, it’s got a sump pump. The dirt is damp underneath the ground. In other words, it has a drainage problem. The sump pump Inis going to have to be removed. You’re going to have to fill it in underneath the house to dry the dirt out and that landscaping was going to be done to take care of the drainage problem.
Mr. Bellott was not in possession of the appraisal during this conversation, but received the page of the appraisal listing the repairs by fax soon thereafter. Mr. Bel-lott testified that Post did not read the appraisal to him, but instead answered his questions about the drainage problem.
The appraisal does not specifically state that the removal of the sump pump is required. The appraisal simply reads, “The dirt under the residence is damp and there is a sump pump to remove excess water, this needs to be filled in and dried out.” Mr. Bellott admitted reading the appraisal page after it was faxed to him. The Bellotts also admitted in their original petition that they “did not have the time or energy to scour” the appraisal. The Bel-lotts clearly should have been aware of what the appraisal actually said.
The settlement statement reflects that there was a payment of $150 for grading work, yet the Bellotts contend that dirt was not put underneath the house as required in the appraisal. Viewing the yard the day before the closing, Mr. Bellott recognized that grading by a dirt contractor had been done. Describing what he saw, Mr. Bellott stated:
You know — as far as we seen, everything was — you know — it was graded, that was supposed to alleviate a water problem. We didn’t know anything about underneath the house at all. I didn’t crawl under the house. I had no reason to. I mean everybody assured me that everything was going to be done.
Even if this court were to assume that Post assumed a duty by telling the Bellotts that all the repairs suggested in the appraisal would be completed prior to closing, this duty was not breached. Post never personally inspected the property. He gained all of his knowledge about the property from Carroll and Davis. Post could reasonably rely on the statements from these professionals that the repairs had been completed. Bellott alleges that Carroll told him that he never reinspected hi>the house, but just relied on Davis’s letter. Nonetheless, Mr. Bellott testified that he has no evidence that Post knew that Carroll’s certificate was false. He also has no evidence that Post knew at the time of closing that the repairs had not been performed as ordered.
Moreover, whether or not Post stated the sump pump was to be removed, and whether or not the crawlspace was filled in with additional dirt are not material facts. Mr. Bellott believes that an underground stream is the source of water under the house. This theory is supported by a letter the Bellotts received from their waterworks district. Mr. Bellott described how he noticed water bubbling in the front yard, dug a hole and the hole filled with water. Tests showed that neither the sewer nor water lines were leaking. Mr. Bel-lott further explained that he believes that whenever it rains, even 15 to 20 miles away, the water table rises and water comes under the house. Mr. Bellott testified that he has no evidence that the plumbing itself is leaking in the house, a sewerage line is leaking in the house or that the septic tank in the yard, which is filled with dirt, is leaking.
Clearly, the existence of the sump pump neither caused nor exacerbated the condition of standing water under the house. Mr. Bellott stated that he had the sump pump removed in October because it was not working. Mr. Bellott attempted to draw a connection between the sump pump *24 and the house’s septic tank. When asked to explain what he believes is the relationship between the sump pump and the septic tank, Mr. Bellott answered, “That the septic tank was failing and that they did not hook on to city sewer and that the sump pump was a band-aid for the septic system.” However, the septic tank was no longer in use and had been filled in with dirt by the time the Bejlotts purchased the home.
Water pooling under the house was not caused by the alleged failure to comply with the appraisal recommendation of filling in the dirt under the residence. The Bellotts have installed vents, put up gutters and done landscaping |13in hopes of improving the drainage, but all to no avail because of the underground source of the water. This is illustrated in paragraph 30 of the Bellotts’ original petition:
On or about December 3, 1996, petitioners had a most startling discovery about the house during a conversation with Bob Davis. He advised them that he had had quite a long discussion with Barr, prior to the sale, during which he advised Barr that the house had intractable drainage problems that were, in his opinion, impossible to repair. It was within a few days of this conversation that petitioners decided against making further efforts at repairing the house and began looking for another house to live in.
Our emphasis.
If the drainage problems were intractable and impossible to repair, filling in the crawlspace with dirt would have obviously made no difference in preventing the alleged damage-causing conditions.
It is undisputed that some work was done by the dirt contractor, as evidenced by the charge for services on the settlement statement. Mr. Bellott testified that the grading had pushed dirt from the crawlspace. We particularly note the following testimony from Mr. Bellott:
If you read that engineer’s report, it talks about the structure of the house and then in a sentence, it talks about the drainage remaining the same. We didn’t know what that meant. We thought that the grading work took care of the drainage problem.
Mr. Bellott discussed how he and his wife went to the house the day before the closing to do a “walk through.” When asked if they went there “[t]o see if things had been done that [he] understood were going to be done[,]” Mr. Bellott replied, “Correct.”
Plaintiffs further contend in their brief that the letter from Davis is in direct contradiction to the appraisal. The Bel-lotts argue that Post was in the best position to notice the discrepancy and inform them. They complain that when they asked for a copy of the report at the closing, Theo Barr and the closing attorney told them that they were not entitled to a copy of the report because they did notl14pay for it. They were allegedly told that they could see the report, but that because no one at the closing had a copy of the report, they would have to look at it later at their convenience. The Bellotts apparently did not see the report until October 8, 1996. Mr. Bellott stated that to the best of his recollection, Post was not present when Mrs. Bellott asked to see the engineer’s report at the closing. Thus, Post would not have been aware that the Bellotts did not have access to Davis’s report at the time of closing.
Mr. Bellott’s deposition testimony indicates that he did not believe the report and appraisal were inconsistent regarding the drainage issue. Mr. Bellott was questioned about what Davis and Carroll each had to say about drainage:
Q: Wait, let me ask the question. What he is saying is — no listen — what he is saying here is, the appraiser had suggested filling the dirt in underneath it. What he is saying is, it should be maintained in its present state.
A: That’s not what he was hired for. That’s not what he was hired for. He *25 was hired to do a structural engineer’s report. He was not hired to do any drainage. What I read that to mean is that, Danny Carroll said this, this, this and this has got to be done and he agrees, just leave it like that. Because I can tell you something—
Q: You just said two different things. You said he agreed, just leave it like that. But then, Danny Carroll said, you had to do this, this, this.
A: No, that’s not what I’m saying. I said Danny Carroll recommended in his appraisal that this work had to be done. Robert Davis came in here and he’s supposed to do a structural report on the house. So, he does a structural report on the house. He writes this sentence about the drainage in there. We take that as Danny Carroll’s work has been done, he agrees with what Danny Carroll says.
Mr. Bellott believes that the sale of the house was part of some conspiracy. Asked if he had any evidence of a conspiracy, Bellott replied:
[Tjhese people were all like this, they’re all in their net, all of them, they know each other, they lived around each other for years. I mean, they do business together. When, you go to one of them and say, do you think that you was — you know — they try to pull the wool over your eyes, like Warren — like Warren Post, we talked to him — you know — help us out Warren. Go to the District Attorney 11Bwith us and let’s tell them what we know. I think they screwed you around too on releasing this money. I mean there’s — it’s just unreal. It’s all in them books. I mean every bit of it, it’s all documented.
When asked if RBL was part of the conspiracy, Mr. Bellott responded, “I wouldn’t — I—I don’t know. I would say probably — well, I really don’t know.”
The Bellotts have not come forth with factual support to show that they will be able to satisfy their evidentiary burden of proof at trial regarding their claims against Post and Ruston Building and Loan Association. Instead, the Bellotts only offer theories and tales of incidents unrelated to Post.
The bottom line is that the Bellotts have presented nothing to indicate that Post and RBL had any knowledge that the recommended repairs had not been properly completed. Further, the Bellotts have not established that Post and RBL had any knowledge of prior sewer leaks. Lastly, the Bellotts have not established that the defects about which they are complaining had anything to do with their alleged damages. The trial judge correctly sustained the motion for summary judgment in favor of Post and RBL.

DECREE

At appellants’ cost, the judgment is AFFIRMED.